UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

                    Plaintiff,

v.

Wesley Robert Warren,

                    Defendant.

Case No. 20-cr-143 (NEB/LIB)

**REPORT AND RECOMMENDATION**

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636 and Local Rule 72.1, upon Defendant Wesley Robert Warren's ("Defendant") Motion to Suppress Statements, [Docket No. 28], as well as, his Motion to Suppress Searches and Seizures. [Docket No. 29]. The Court held a Motions Hearing on October 13, 2020, regarding the parties' pretrial motions.[1]

At the Motions Hearing, the parties requested, and were granted, the opportunity to submit supplemental briefing. Upon the completion of that briefing, Defendant's Motion to Suppress Statements, [Docket No. 28], and his Motion to Suppress Searches and Seizures, [Docket No. 29], were taken under advisement.

For reasons discussed herein, the Court recommends that Defendant's Motion to Suppress Statements, [Docket No. 28], be **GRANTED in part and DENIED in part**, and Defendant's Motion to Suppress Searches and Seizures, [Docket No. 29], be **DENIED**.

I.      **Background and Statement of Facts**

        A. **Background**

---

[1]The Court addressed the parties' pretrial motions for discovery and production of evidence by separate Order. [Docket No. 39].

Defendant is charged with one (1) count of assault with intent to commit murder in violation of 18 U.S.C. §§ 113(a)(1), 1151, and 1153(a); one count of assault with a dangerous weapon in 18 U.S.C. §§ 113(a)(1), 1151, and 1153(a); one count of assault resulting in serious bodily injury in violation of 18 U.S.C. §§ 113(a)(6), 115, and 1153(a); and one count of robbery in violation of 18 U.S.C. §§ 1151, 1153(a), and 2111.

**B.  Facts**[2]

The record presently before the Court indicates that in the early morning hours of June 3, 2020, law enforcement officers from the Becker County Sherriff's Office and the White Earth Police Department responded to a report of an assault outside a residence located on 490th Ave, Ponsford, Minnesota. (Gov't Ex. 1 at 2).[3] Upon arriving at the scene law enforcement officers observed "RDH . . . a known male laying on his back, unconscious and . . . bleeding from the nose and both eyes had swelling." (Id.).

Douglas Clark, an individual on the scene, reported to law enforcement that Defendant had been arguing with Audrey Jones when Defendant began scattering her property across the road. (Id.). During this argument, RDH[4] was "dropped off at the driveway and came into the yard and fought with both" Defendant and Warren Brown. (Id.). Mr. Clark reported that the altercation resulted in RDH being rendered unconscious at which time Warren Brown and Defendant began to exit the yard. (Id.).

---

[2] The facts contained in this section are derived from the testimony of White Earth Police Department Criminal Investigator Breeann Brandenburger (hereinafter "Inv. Brandenburger") and Becker County Sheriff's Office Special Agent Mark Pinoniemi (hereinafter "SA Pinoniemi") at the October 13, 2020, Motions Hearing, as well as, the Government's exhibit presented in the present case.

[3] Government's Exhibit 1 is the warrant application, supporting affidavit, and warrant to search Defendant's person, a residence, and a vehicle parked at said residence. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 1. (Tr. 13).

[4] The Government's exhibits refer to the victim as RDH; although the victim's identity is known, it is unnecessary to the present issues under consideration, and therefore, the Court refers to the victim by the nomenclature used in the exhibits.

Mr. Clark also reported that he saw Defendant throw a cinder block at RDH; however, Mr. Clark did not see where the cinder block landed. (Id.). Mr. Clark then observed Defendant return to RDH who was laying unconscious face down on the ground, go through RDH's back pockets, turn over RDH's body, and search through RDH's front pockets. (Id.). Warren Brown and Defendant were then observed leaving the scene in a tan Jeep Grand Cherokee. (Id.). The vehicle initially travelled south, but it "then returned and went north without headlights on." (Id.).

Law enforcement officers also spoke with Andrea Clark on the scene, and she reported that she witnessed Defendant throw a cinder block at RDH's head. (Id. at 3). She further reported that the cinder block struck RDH's head. (Id.). Ms. Clark also heard Defendant state that "he should check [RDH] for money" before Defendant searched RDH's pockets. (Id.). Officers then took possession of a cinder block which "appeared to have blood on it." (Id.).

SA Pinoniemi later learned that the Clark residence had a video doorbell which took digital pictures of the altercation, and he was able to download those pictures. (Id.).

Approximately twelve hours after the incident took place, law enforcement officers stopped a tan Jeep Grand Cherokee, and the driver was identified as Warren Brown. (Id.). Mr. Brown admitted that he had been "fighting an old man last night," and Defendant had been with him at the time. (Id.). Mr. Brown reported that the incident had occurred at "KK's house" which officers knew to refer to the Clark residence where the incident described above occurred. (Id.).

Later that day on June 3, 2020, law enforcement officers learned that Defendant had an outstanding Department of Corrections State Court warrant for his arrest, and his last known address described on that warrant was on 280th Street, Ponsford, Minnesota. Law enforcement officers proceeded to that address in an attempt to arrest Defendant.

Upon arriving at the residence, the officers knocked on the door and announced that they were law enforcement officers. (Gov't's Ex. 6).[5] The officers located Defendant in a bedroom of the residence, and they instructed him to enter the hallway where they placed him in handcuffs. Defendant asked to smoke a cigarette and to call his grandmother. (Id. at 0:30–6). The officers told Defendant he could smoke a cigarette outside, and he asked them to help him locate those cigarettes. (Id.). The officers assisted Defendant in looking for cigarettes, and then the officers and Defendants exited the residence. (Id.). When Defendant began exiting the residence, he stated that he wanted to tell his aunt what was happening, and upon exiting the residence Defendant began walking towards his aunt's residence next door. (Id. at 5–7). Officers instead directed Defendant to their patrol vehicles. (Id.). In the video of the encounter, it can be seen that Defendant has a cast on his left foot, and there is a substance visible on his shorts. (Id.). The officers stayed with Defendant in the front lawn of the residence.

A civilian female approached Defendant to provide him with a cigarette, and she asked Defendant "what happened" to him. (Id.). Defendant responds that he had "sprained his ankle." (Id.). Inv. Brandenburger then asked Defendant what was on his shorts to which Defendant responded that he did not know. (Id.). Inv. Brandenburger then provided Defendant with a cell phone to call his grandmother as he requested, and the officers permitted him to smoke another cigarette. (Id. at 7–10).

While Defendant was smoking the cigarette, he asked if the arrest was based on only a "DOC warrant" to which Inv. Brandenburger responded that there was a "DOC warrant," but there might be more. (Id. 9–12). Inv. Brandenburger then asked Defendant what he "did to his foot," and Defendant responded that he had sprained it. (Id.). Inv. Brandenburger also asked how

---

[5] Government's Exhibit 6 is a video recording of the officers at the residence arresting Defendant. The recording is from the body camera of Inv. Brandenburger who stayed outside the residence until the entering officers located Defendant inside the residence. At the Motions Hearing, the Government, without objection, offered the video recording into evidence as Government's Exhibit 6. (Tr. 13).

Defendant had sprained it, and Defendant responded that he fell off his porch. (Id.). When Inv. Brandenburger asked when it had happened, Defendant stated that it happened "last night." (Id.). Inv. Brandenburger then began inquiring into whether or not Defendant had sought medical care for his foot, and if so, where he had sought said care. (Id.). Defendant responded to Inv. Brandenburger's inquires. (Id.).

Upon finishing his cigarette, Defendant stated, "let's get this show on the road," and Defendant and Inv. Brandenburger began walking to her patrol vehicle. (Id. at 11–13:30). Defendant was placed in the back of Inv. Brandenburger's patrol vehicle, and upon his request, he was provided with a drink. (Id.). Invs. Brandenburger then closed the door, and she walked away from her patrol vehicle. (Id.).

SA Pinoniemi then approached the patrol vehicle, and he opened the door where Defendant was seated. (Gov't's Ex. 8 at 1–2).[6] SA Pinoniemi introduced himself, told Defendant that he was placed under arrest because of his outstanding DOC arrest warrant, and informed Defendant that SA Pinoniemi would also like to talk with Defendant about what had happened "last night." (Id. at 1:30–3). Defendant interjected that he was unaware of "what [SA Pinoniemi was] talking about." (Id.). SA Pinoniemi continued that he could explain things to Defendant, but Defendant was under arrest so before he could talk with Defendant, he needed to inform Defendant of his rights.

SA Pinoniemi then read Defendant a recitation of his Miranda[7] rights. SA Pinoniemi asked if Defendant understood his rights, and Defendant responded, "yeah." When SA Pinoniemi asked if Defendant wanted to talk with him, Defendant asked why he was under arrest? Another officer standing next to SA Pinoniemi answered that Defendant was under arrest for his "DOC

---

[6] Government's Exhibit 8 is a video recording of SA Pinoniemi's interaction with Defendant. The recording is from the body camera of Investigator Tyrell Rishovd. At the Motions Hearing, the Government, without objection, offered the video recording into evidence as Government's Exhibit 8. (Tr. 13).
[7] Miranda v. Arizona, 384 U.S. 436 (1966).

warrant," and Defendant inquired why the officers were talking to him about a "DOC warrant." SA Pinoniemi responded that he wanted to talk to Defendant about the "incident on the next road over" referring to the assault described above. Defendant said he was unaware of the incident to which the officers were referring. (Id.). The officers informed Defendant that witnesses saw him at the scene of the incident, and that he was on video at the incident. (Id.). While the officers were stating this, Defendant was looking past the officers, and Defendant stated, "give me a lawyer." (Id.). SA Pinoniemi says "ok," and he began to close the folder he was holding. (Id.).

Defendant then spoke loudly out the car door to a civilian standing out of view of the recording. (Id. at 3–6:22). Defendant yelled, "love you guys. I'll see you." (Id.). SA Pinoniemi then asked Defendant if he was living at the residence or if he was living at some other location. (Id.). Defendant hesitated to respond, and SA Pinoniemi stated that "this are just general questions." (Id.). The second officer then asked Defendant who the residence belonged to, and Defendant responded that it was his grandmother's house. (Id.). SA Pinoniemi then asked Defendant's grandmother's name. (Id.).

Defendant continued to loudly speak to the civilian female behind the officers; this civilian female cannot be seen on the recording. (Id.). Defendant told her he "don't even know what the fuck's going on. They trying to say I robbed [indiscernible] or something." (Id.). The unidentified civilian female asked Defendant if he had done it, and Defendant responded, "No, I was fucking sleeping last night." (Id.).

During Defendant's interaction with the civilian female, SA Pinoniemi and the second officer where still attempting to ask Defendant his grandmother's name, and the name of another individual on the scene who was near the house where Defendant was arrested. (Id.). Defendant identified that other individual as his mother. (Id.). SA Pinoniemi then closed the door of the patrol vehicle. (Id.).

Defendant's mother then asked the officers if she could speak to Defendant. An officer responds, "sure," and he opened the door of the patrol vehicle so they could speak. Defendant spoke with his mother and one other individual for approximately two minutes. (Id.). The officers then closed the door to the patrol vehicle. (Id.).

Inv. Brandenburger then transported Defendant to the Becker County Jail. (Tr. 26).[8] Upon arriving at the Becker County Jail, Inv. Brandenburger escorted Defendant into the facility, and at some time thereafter, Invs. Brandenburger attempted to take photographs of Defendant's hands after she had noticed "some abrasion[s] and an injury to his hand." (Tr. 27–28). At the October 13, 2020, Motions Hearing, Inv. Brandenburger testified that she wanted to take the pictures because they "could provide evidence or often times we document injuries before book-in." (Tr. 28). Defendant refused to permit Inv. Brandenburger to take pictures of his hands. (Tr. 29).[9]

On June 3, 2020, Jon Peterson, an Investigator with the Becker County Sherriff's Office (hereinafter "Inv. Peterson"), submitted two applications for state court search warrants. Inv. Peterson first submitted a state court application for a search warrant to authorize law enforcement to search the tan Jeep Grand Cherokee which Warren Brown had been driving when he was arrested. (Gov't Ex. 2).[10] The application sought to search for the following:

> Trace or microscopic evidence, including but not limited to: blood samples, hairs, finger print evidence, body fluids or excretion, clothing, fibers, soil, projectiles; weapons used, or possibly used in the assault of the victim and/or other crimes

---

[8] Throughout this Report and Recommendation, the Court refers to the transcript of the October 13, 2020, Motions Hearing by the abbreviation "Tr." (Transcript [Docket No. 40]).

[9] The record presently before the Court is indeterminate on whether or not pictures were actually taken of Defendant's hands. At the October 13, 2020, Motions Hearing, neither Inv. Brandenburger nor SA Pinoniemi testified as to whether or not pictures were taken of Defendant's hands. In his memorandum, Defendant states that pictures were taken, and in support of that assertion, he cites to the transcript of the October 13, 2020, Motions Hearing; however, the testimony to which Defendant cites refers only to pictures being taken of the scene of the assault. (See, Def.'s Mem., [Docket No. 41], at 4).

[10] Government's Exhibit 2 is the warrant application, supporting affidavit, and warrant to search the described tan Jeep Grand Cherokee. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 2. (Tr. 13).

committed; permission to obtain additional photographs of the vehicle; [w]ritings, documents, recorded oral communications which may aid in the identification of the injured victim, or any other person involved in or witness to the assault of the victim and to show ownership or possession of the property involved; electronically stored data contained in cellular telephones, pagers; computers and access to the data contained within, including surveillance video and or video storage devices, and permission to remove those items to be forensically downloaded at another location by the Becker County Sheriff's Office or MN BCA. Any as yet unidentified/undiscovered items that might tend to show cause of Injury and nature of crime committed.

(Id.).

In his affidavit submitted in support of the search warrant for the Jeep, Inv. Peterson provided the details of the investigation, as described above, and the details of Defendant's arrest. (Id.). Inv. Peterson further attested that when law enforcement officers first located Defendant, he was not wearing a shirt. (Id.). Inv. Peterson provided that based on his training and experience the type of evidence sought by the search warrant "can be left or transferred to the vehicle by suspects involved in the incident." (Id.).

The Honorable Michael Fritz, District Court Judge for the State of Minnesota, Seventh Judicial District, County of Clay, determined that probable cause existed to support the issuance of the June 3, 2020, Jeep Grand Cherokee Search Warrant. (Id.). Thereafter, law enforcement officers executed the June 3, 2020, Search Warrant on the Jeep Grand Cherokee that had been driven by Warren Brown.

Inv. Peterson also submitted a second state court application for a search warrant to authorize law enforcement to search Defendant's person; inside the residence where Defendant had been arrested; and a black Pontiac vehicle parked at the residence where Defendant had been arrested. (Gov't Ex. 1). The application sought to search for the following:

Trace or microscopic evidence, including but not limited to: blood samples, hairs, finger print evidence, body fluids or excretions, clothing, fibers, soil, projectiles; weapons used, or possibly used in the assault of the victim and/or other crimes committed; Permission to photgraphically [sic] document the residence, vehicle

and Wesley Robert Warren; Clothing currently being wore by Wesley Robert
Warren . . . who is in custody at the Becker County Jail, or clothing disgarded
[sic] at the residence or vehicle; Writings, documents, recorded oral
communications which may aid in the identification of the injured victim, or any
other person possibly involved in or witness to the assault of the victim and to
show ownership or possession of the property involved, including documents
and/or items belonging to the victim RDH; electronically stored data contained in
cellular telephones, including cellular phone(s) belonging to Wesley Robert
Warren; Computers and access to the data contained within, including
surveillance video and/or video storage devices, and permission to remove those
items to be forensically downloaded at another location by the Becker County
Sheriff's Office or the MN BCA. Any as yet unidentified/undiscovered items that
might tend to show cause of injury and nature of crime committed.

(Id.).

In his affidavit in support of this second warrant, Inv. Peterson again provided the details

of the investigation, as described above, and the details of Defendant's arrest, including the fact

that Defendant had first been discovered without a shirt. (Id.). Inv. Peterson attested that based

on his training and experience the type of evidence sought by the search warrant "can be left or

transferred to the vehicle or other residences by suspects involved in the incident." (Id.).

The Honorable Michael Fritz, District Court Judge for the State of Minnesota, Seventh

Judicial District, County of Clay, determined that probable cause existed to support the issuance

of the second June 3, 2020, Search Warrant. (Id.). Thereafter, law enforcement officers executed

the second June 3, 2020, Search Warrant.

On June 4, 2020, Inv. Peterson submitted a state court application for a search warrant to

authorize law enforcement to secure a DNA sample from Defendant's person. (Gov't Ex. 3).[11] In

support of this application, Inv. Peterson submitted an affidavit similar to his previous affidavits.

His affidavit also provided that he had seized Defendant's clothes, and both Defendant's shorts

and underwear "appeared to have dried blood stains on them." (Id.). Inv. Peterson attested that

---

[11] Government's Exhibit 3 is the warrant application, supporting affidavit, and warrant to secure a DNA sample
from Defendant's person. At the Motions Hearing, the Government, without objection, offered the warrant
application, supporting affidavit, and warrant into evidence as Government's Exhibit 3. (Tr. 13).

based on his training and experience "comparison of DNA evidence to known samples is the preferred method of processing and identifying DNA profiles," and he was requesting permission to collect Defendant's DNA sample for such "comparison purposes." (Id.).

The Honorable Michael Fritz, District Court Judge for the State of Minnesota, Seventh Judicial District, County of Clay, determined that probable cause existed to support the issuance of the June 4, 2020, DNA Search Warrant. (Id.). Thereafter, law enforcement officers executed the June 4, 2020, DNA Search Warrant.

On June 8, 2020, SA Pinoniemi submitted a state court application for a search warrant to authorize law enforcement to search the contents of three cellular telephones (hereinafter the "Subject Phones"). (Gov't Ex. 4).[12] In support of this application, SA Pinoniemi submitted an affidavit similar to his previous affidavit. In addition to detailing the above investigation and Defendant's arrest, his affidavit also provided where each of the three Subject Phones had been located. (Id.). The first Subject Phone was located at the scene of the assault underlying the present Indictment, and witnesses on the scene reported that the Subject Phone had been thrown at the house. (Id.). The second Subject Phone was collected from Warren Brown when he was arrested. (Id.). The third Subject Phone was located when law enforcement executed the June 3, 2020, Search Warrant on the Jeep Grand Cherokee Warren Brown was driving at the time of his arrest. (Id.).

SA Pinoniemi's affidavit further provided that, based on his training an experience, persons commonly communicate with one another through the use of electronic means, such as cellular telephones. (Id.). He noted that the search warrant was needed "to gain information/evidence contained in the cell phones related to the said assault in that the property

---

[12] Government's Exhibit 4 is the warrant application, supporting affidavit, and warrant to search the contents of three cellular telephones. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 4. (Tr. 13).

may have been used in commission of the crime, the property may tend to show the crime was committed, and that a particular person committed a crime." (Id.).

The Honorable Gretchen Thilmony, District Court Judge for the State of Minnesota, Seventh Judicial District, County of Becker, determined that probable cause existed to support the issuance of the June 8, 2020, Cell Phone Search Warrant. (Id.). Thereafter, law enforcement officers executed the June 8, 2020, Cell Phone Search Warrant.

On June 15, 2020, White Earth Police Department Investigator Kristopher Larson (hereinafter "Inv. Larson") submitted a state court application for a search warrant to authorize law enforcement to search the contents of the Facebook accounts of Warren Brown, as well as, Defendant's Facebook account. (Gov't Ex. 5).[13] Inv. Larson submitted an affidavit in support of his application for a search warrant.

In addition to detailing the above investigation and Defendant's arrest, Inv. Larson's affidavit specifically stated that it was Defendant who had been involved in a fight with the victim of the assault underlying the present Indictment. (Id.). It further provided that Warren Brown had informed law enforcement that Defendant did not then currently have a cellular phone, and that Warren Brown had communicated with Defendant through Facebook. (Id.). Inv. Larson further provided that based on his training and experience he was aware that individuals involved in criminal activity often utilized Facebook to communicate regarding their criminal activities in an effort to avoid detection by law enforcement. (Id.). Inv. Larson further provided that he had viewed and observed the subject accounts to verify that they had recently been used. (Id.).

---

[13] Government's Exhibit 5 is the warrant application, supporting affidavit, and warrant to search the contents of the two Facebook accounts. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant into evidence as Government's Exhibit 5. (Tr. 13).

The Honorable Gretchen Thilmony, District Court Judge for the State of Minnesota, Seventh Judicial District, County of Becker, determined that probable cause existed to support the issuance of the June 15, 2020, Facebook Search Warrant. (Id.). Thereafter, law enforcement officers executed the June 15, 2020, Facebook Search Warrant.

## II.    Defendant's Motions to Suppress Statements. [Docket No. 29].

Defendant moves the Court for an Order suppressing several statements he made after his arrest on June 3, 2020, arrest. (Def.'s Mot. [Docket No. 29]). Specifically, Defendant's Motion seeks to suppress six statements he made: (1) his response to Inv. Brandenburger's inquiry regarding what was on Defendant's shorts at the time he was arrested; (2) his response to Inv. Brandenburger's inquiry regarding what had happened to Defendant's foot; (3) Defendant's statement made immediately after SA Pinoniemi told Defendant the reasons the officers were speaking with Defendant; (4) his response to SA Pinoniemi's question regarding Defendant's place of residence; (5) the statements he made to the civilian female nearby while SA Pinoniemi was asking Defendant questions; and (6) his response to Inv. Brandenburger's request to photograph his hands at the Becker County Jail. (Def.'s Mem., [Docket No. 41], at 2–9).

Regarding the first, second, and third statements, Defendant argues that his statements should be suppressed because they were obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966). (See, Def.'s Mem., [Docket No. 41], at 2–9). Regarding his fourth, fifth, and sixth statements, Defendant argues the statements should be suppressed because they were obtained after he invoked his Fifth Amendment right to counsel. (Id.).

The Government argues that Defendant's statements to the civilian female while SA Pinoniemi was asking Defendant questions are not subject to suppression because these statements were spontaneously made by Defendant. (Govt's Mem., [Docket No. 44], at 7–9). The Government fails to offer any argument in opposition to, or even acknowledge, Defendant's

request regarding suppression of his statement he made immediately after SA Pinoniemi told Defendant the reasons the officers were speaking with Defendant. (See, Id.). Regarding Defendant's first, second, fourth, and sixth statements,[14] the Government "concedes that [these] responses by the [D]efendant were the result of interrogation or after [he] invoked counsel," and therefore, the Government "agrees that such statements will not be used in [its] case-in-chief if this matter proceeds to trial." (Id.).

Therefore, to the extent Defendant's Motion to Suppress Statements seeks an Order of this Court suppressing his response to Inv. Brandenburger's inquiry regarding what was on Defendant's shorts at the time he was arrested; his response to Inv. Brandenburger's inquiry regarding what had happened to Defendant's foot; his response to SA Pinoniemi's question regarding Defendant's place of residence; and his response to Inv. Brandenburger's request to photograph his hands at the Becker County Jail, the undersigned recommends that Defendant's Motion to Suppress Statements, [Docket No. 28], be **GRANTED**.

This leaves for this Court's consideration Defendant's statement he made to SA Pinoniemi immediately after SA Pinoniemi told Defendant the reasons the officers were speaking with Defendant, as well as, the statements Defendant made to the nearby civilian female while SA Pinoniemi was asking Defendant questions. (Def.'s Mem., [Docket No. 41], at 2–9).

### A. Standard of Review

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United

---

[14] Defendant's response to Inv. Brandenburger's inquiry regarding what was on Defendant's shorts at the time he was arrested; his response to Inv. Brandenburger's inquiry regarding what had happened to Defendant's foot; his response to SA Pinoniemi's question regarding Defendant's place of residence; and his response to Inv. Brandenburger's request to photograph his hands at the Becker County Jail.

States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Accordingly, Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444). "Interrogation under Miranda includes not only express questioning but also its functional equivalent, such as 'any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." United States v. Hull, 419 F.3d 762, 767 (8th Cir. 2005) (quoting Rhode Island v. Innis, 466 U.S. 291, 300–01 (1980)).

A defendant is entitled to a Miranda warning prior to custodial interrogation. Miranda, 384 U.S. at 444–45. Interrogation for Miranda purposes includes "any questioning or conduct that the government officer should know is reasonably likely to elicit an incriminating response." United States v. McLaughlin, 777 F.2d 388, 390 (8th Cir. 1985). Whether an incriminating response is sought by an officer is determined "from the perspective of the suspect" and not by the officer's actual intent. United States v. Richardson, 427 F.3d 1128, 1132 (8th Cir. 2005).

**B. Analysis**

As already noted above, Defendant moves the Court for an Order suppressing his June 3, 2020, statement he made to SA Pinoniemi immediately after SA Pinoniemi told Defendant the reasons the officers were speaking with Defendant, as well as, his June 3, 2020, statement he made to the civilian female nearby while law enforcement officers were present. It is undisputed that Defendant was in custody at the time he made these statements.

As noted above, Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury, 511 U.S. at 322 (quoting Miranda, 384 U.S. at 444). To be subject to

suppression under <u>Miranda</u>, however, a statement must be made while in custody and in response to interrogation. <u>United States v. McGlothen</u>, 556 F.3d 698, 701 (8th Cir. 2009) (citing <u>United States v. Londondio</u>, 420 F.3d 777, 783 (8th Cir. 2005)).

Thus, a statement that is voluntary and is "not the product of police questioning or police action likely to produce an incriminating response" is admissible even when made without the benefit of a <u>Miranda</u> warning. <u>Richardson</u>, 427 F.3d at 1132; <u>see</u>, <u>United States v. McCoy</u>, 200 F.3d 582, 584 (8th Cir. 2000) (statements that are spontaneous and voluntary do not require suppression). Accordingly, "<u>Miranda</u> has no application to statements . . . that are voluntarily offered and not a product of either express questioning or any police practice reasonably likely to evoke an incriminating response." <u>United States v. Griffin</u>, 922 F.2d 1343, 1357 (8th Cir. 1990) (citations omitted). "<u>Miranda</u> does not protect an accused from a spontaneous admission made under circumstance not induced by the investigating officers or during a conversation not initiated by the officers." <u>United States v. Hayes</u>, 120 F.3d 739, 744 (8th Cir. 1997) (quoting <u>United States v. Hawkins</u>, 102 F.3d 973, 975 (8th Cir. 1996), cert. denied, 520 U.S. 1179 (1997)).

Therefore, regarding Defendant's at issue statements, the threshold issue is whether or not Defendant's statements were spontaneous. The Court finds that Defendant's statements here were entirely voluntary and spontaneous. <u>See</u>, <u>United States v. Travis</u>, No. 14-cr-253 (DSD/SER), 2015 WL 439393, at *22 (D. Minn. Feb. 3, 2015) (finding that where the defendant was not asked any questions by law enforcement the defendant was not subject to an interrogation and made spontaneous statements); <u>United States v. Turner</u>, 157 F.3d 552, 556 (8th Cir. 1998) ("We have repeatedly held that '[a] voluntary statement made by a suspect, not in response to interrogation, is not barred . . . and is admissible with or without the giving of <u>Miranda</u> warnings.'") (alteration in original); <u>United States v. Barnes</u>, 195 F.3d 1027, 1029 (8th

15

Cir. 1999) (finding spontaneous a defendant's statement that the officer was incorrect after he had advised defendant he was going to be booked for possession of a firearm because the statement was in response to a statement of fact not the functional equivalent of interrogation); Hawkins, 102 F.3d at 975 (holding that Miranda does not bar the government from introducing into evidence spontaneous statements made during a conversation).

### 1.  Defendant Statement to SA Pinoniemi

Defendant first moves to suppress his June 3, 2020, statement he made to SA Pinoniemi immediately after SA Pinoniemi told Defendant the reasons the officers were speaking with Defendant. It is undisputed that Defendant made this statement before SA Pinoniemi provided Defendant with a Miranda warning.

The record presently before the Court demonstrates that SA Pinoniemi was merely informing Defendant of the reasons law enforcement wanted to speak with Defendant when Defendant, without prompting, made a statement to the effect that he did not know what SA Pinoniemi was talking about. Notably, on the record now before the Court, law enforcement's actions during the arrest of Defendant were "not accompanied by any threats or other coercive pressures," and SA Pinoniemi's conduct during this portion of the encounter with Defendant was not designed to illicit any incriminating response from Defendant. United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005).

Defendant acknowledges that controlling Eighth Circuit Court of Appeals precedent establishes that a law enforcement officer's announcement of the purpose for law enforcement officer's presence is not an interrogation. (See, Def.'s Mem., [Docket No. 41], at 6–7). In refuting the application of this controlling precedent, Defendant merely conclusorily states that SA "Pinoniemi's statement was in the nature of an inquiry . . . designed to elicit an immediate

response." (Id. at 7). The Court finds this conclusory, implicit argument unpersuasive for at least two reasons.

First, the Eighth Circuit Court of Appeals has previously rejected this precise argument. See, United States v. McGlothen, 556 F.3d 698, 701–02 (8th Cir. 2009) (finding spontaneous a defendant's statement that he owned a specific firearm and that he had bought it for his own protection after the officers had informed Defendant why the were there, told him he was under arrest, and presented him with the gun the officers found in his residence). Second, Defendant's characterization regarding SA Pinoniemi's conduct is contradicted by the record now before the Court. As detailed above, SA Pinoniemi approached the patrol vehicle in which Defendant was sitting, opened the vehilce's door, introduced himself, explained why Defendant had been arrested, and began explaining why the officers were there to speak with Defendant. In this video recorded interaction, there is nothing in SA Pinoniemi's words or conduct which could reasonably be interpreted to be words or conduct designed to illicit an incriminating response.

Because SA Pinoniemi did not ask Defendant any questions, did not apply any coercive pressures, and did not speak any words or take any actions which were reasonably likely to elicit an incriminating response at the time Defendant made the statement now at issue, Defendant was not being interrogated for the purposes of Miranda when he told SA Pinoniemi that Defendant was unaware of what SA Pinoniemi was talking about. See, Hawkins, 102 F.3d at 975 (holding that Miranda does not bar the government from introducing into evidence spontaneous statements made during a conversation); Hull, 419 F.3d at 767; McLaughlin, 777 F.2d at 390. Therefore, because Defendant, at the time of this statement, voluntarily offered the statement to SA Pinoniemi in a verbal exchange without any words or actions by SA Pinoniemi that were reasonably likely to elicit an incriminating response, this statement by Defendant to SA Pinoniemi was voluntary and spontaneous. See, e.g., United States v. McGlothen, 556 F.3d 698,

701–02 (8th Cir. 2009) (finding spontaneous a defendant's statement that he owned a specific firearm and that he had bought it for his own protection after the officers had informed Defendant why the were there, told him he was under arrest, and presented him with the gun the officers found in his residence); United States v. Turner, 157 F.3d 552, 556 (8th Cir. 1998) ("We have repeatedly held that '[a] voluntary statement made by a suspect, not in response to interrogation, is not barred . . . and is admissible with or without the giving of Miranda warnings.'") (alteration in original); United States v. Barnes, 195 F.3d 1027, 1029 (8th Cir. 1999) (finding spontaneous a defendant's statement that the officer was incorrect after he had advised defendant he was going to be booked for possession of a firearm because the statement was in response to a statement of fact not the functional equivalent of interrogation).

Therefore, to the extent Defendant's Motion to Suppress Statements seeks an Order of this Court suppressing his June 3, 2020, statement he made to SA Pinoniemi denying any knowledge about the stated reason the officers were speaking with Defendant, the undersigned recommends that Defendant's Motion to Suppress Statements, [Docket No. 28], be **DENIED**.

### 2. Defendant's Statement to the Unknown Nearby Civilian Female

Defendant moves to suppress his June 3, 2020, statements he made to the civilian female nearby while SA Pinoniemi was asking Defendant questions.[15] It is undisputed that Defendant made these statements after SA Pinoniemi provided Defendant with a Miranda warning and after Defendant had invoked his Fifth Amendment right to assistance of counsel.

The record presently before the Court demonstrates that although SA Pinoniemi was asking Defendant where he lived when Defendant began speaking to the nearby civilian female, Defendant's statements were not in response to any question by nor even directed at SA

---

[15] Defendant seeks to suppress the statements he made to the unknown civilian female while SA Pinoniemi was asking Defendant questions. (See, Def.'s Mem., [Docket No. 41], at 4, 8). Defendant does not now seek to suppress the statements he made to his mother after she requested to speak with Defendant. (See, Id.).

Pinoniemi. It is readily apparent from the video recording of the interaction that Defendant, in leaning to the side to speak past SA Pinoniemi, is speaking louder than SA Pinoniemi so that he can be heard by the unknown female who is off camera in the recording. After Defendant initially speaks to the female, he engages in a brief conversation with her in disregard of and while SA Pinoniemi continued to attempt to ask questions of Defendant.

Defendant's only assertion in support of suppressing this statement is that SA Pinoniemi "should have shut the door of the squad car," but "[i]nstead he kept it open hoping that [Defendant] would speak with his nearby family members." This characterization of the record is unsupported by the video recording of the encounter in evidence. Defendant initiated the conversation with the nearby civilian female while SA Pinoniemi was still attempting to ask questions of Defendant.

There is no indication on the record now before the Court that Defendant's statement to a civilian female was in response to any conduct by SA Pinoniemi designed to illicit any incriminating response from Defendant. Likewise, law enforcement's actions at the time Defendant made the statement to the civilian female were not accompanied by any threats or other coercive pressures.

Instead, the record now before the Court demonstrates that Defendant's statements to the civilian female were voluntary and spontaneous for the purposes of Miranda. Consequently, Defendant's voluntary and spontaneous statements to the civilian female are not subject to suppression. See, e.g., United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005); United States v. McGlothen, 556 F.3d 698, 701–02 (8th Cir. 2009); Hawkins, 102 F.3d at 975; Hull, 419 F.3d at 767; McLaughlin, 777 F.2d at 390; United States v. Turner, 157 F.3d 552, 556 (8th Cir. 1998); United States v. Barnes, 195 F.3d 1027, 1029 (8th Cir. 1999).

Therefore, to the extent Defendant's Motion to Suppress Statements seeks an Order of this Court suppressing the June 3, 2020, statements he made to the nearby civilian female while SA Pinoniemi was asking Defendant questions, the undersigned recommends that Defendant's Motion to Suppress Statements, [Docket No. 28], be **DENIED**.

**III.    Defendant's Motion to Suppress Searches and Seizures. [Docket No. 29].**

Defendant next seeks to suppress all evidence flowing from the five state court search warrants outlined above. (Def.'s Mot. [Docket No. 29]). Specifically, Defendant seeks to suppress all evidence flowing from the June 3, 2020, Jeep Search Warrant; the second June 3, 2020, Search Warrant authorizing the search of Defendant's person, the residence in which he had been arrested, and a vehicle outside that residence; the June 4, 2020, DNA Search Warrant; the June 8, 2020, Cell Phone Search Warrant; and the June 15, 2020, Facebook Search Warrant. (Def.'s Mem., [Docket No. 41], at 9–14). Defendant argues that the evidence flowing from each of these search warrants should be suppressed because the affidavit submitted in support of the application for each of these search warrants failed to establish a nexus between the evidence sought and the place to be searched. (Id.).

**A.  Standard of Review**

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." United States v. Davis, 569 F.3d 813, 816 (8th Cir. 2009) (citing Katz v. United States, 389 U.S. 347, 357 (1967)).

The Eighth Circuit has held that "[a]n affidavit establishes probable cause for a warrant if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." United States v. Mutschelknaus, 592 F.3d 826, 828 (8th Cir. 2010) (internal quotation marks and citation omitted). "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" United States v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)). Courts use a "totality of the circumstances test . . . to determine whether probable cause exists." United States v. Hager, 710 F.3d 830, 836 (8th Cir. 2013) (citation omitted).

The sufficiency of a search warrant affidavit is examined using "common sense and not a hypertechnical approach." United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007) (citation and internal quotations omitted). "In ruling on a motion to suppress, probable cause is determined based on 'the information before the issuing judicial officer.'" United States v. Smith, 581 F.3d 692, 694 (8th Cir. 2009) (quoting United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)). "Therefore, '[w]hen the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, only that information which is found in the four corners of the affidavit may be considered in determining the existence of probable cause.'" United States v. Wiley, No. 09–cr–239 (JRT/FLN), 2009 WL 5033956, at *2 (D. Minn. Dec. 15, 2009) (Tunheim, J.) (quoting United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005)) (alterations in Wiley). In addition, the issuing court's "determination of probable cause should be paid great deference by reviewing courts." Gates, 462 U.S. at 236 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)). "[T]he duty of a reviewing court is simply to ensure that the [issuing court] had a 'substantial

basis for . . . conclud[ing]' that probable cause existed." Id. at 238–39 (quoting Jones v. United States, 362 U.S. 257, 271 (1960)).

### B. June 3, 2020, Jeep Search Warrant and June 8, 2020, Cell Phone Search Warrant

The Court first addresses Defendant's request to suppress all evidence flowing from the June 3, 2020, Jeep Search Warrant and the June 8, 2020, Cell Phone Search Warrant. As discussed above, the June 3, 2020, Search Warrant authorized law enforcement to search the tan Jeep Grand Cherokee which Warren Brown had been driving when he was arrested. (Gov't Ex. 2). The June 8, 2020, Cell Phone Search Warrant authorized law enforcement to search the contents of three subject phones. Defendant argues that each of these search warrants fails to present a nexus between the contraband to be searched for and the place to be searched.

The Court must first address the threshold issue of standing. Defendant may only challenge a search warrant for which he has standing to challenge.

As noted above, the Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. However, Fourth Amendment rights are personal, and therefore, they may not be asserted vicariously. United States v. Barragan, 379 F.3d 524, 529 (8th Cir. 2004) (citing Rakas v. Illinois, 439 U.S. 128, 133–34 (1978)).

"An individual asserting Fourth Amendment rights 'must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable.'" Barragan, 379 F.3d at 529 (citing Minnesota v. Carter, 525 U.S. 83, 88 (1998)); Rakas, 439 U.S. at 133–34. The Defendant bears the burden of proving a reasonable expectation of privacy in the area searched. Rakas, 439 U.S. at 130–31.

To establish a legitimate expectation of privacy, the Defendant must show a subjective expectation of privacy and that his expectation of privacy is one that society is prepared to recognize as objectively reasonable. "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched, he has no standing to claim that they were searched or seized illegally." Barragan, 379 F.3d at 529–30 (citing United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994)). Ultimately, "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." Rakas, 439 U.S. at 134.

The Eighth Circuit has enumerated factors for Courts to consider in deciding whether a Defendant had an expectation of privacy triggering standing to challenge the constitutionality of a search including:

> [O]wnership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

Gomez, 16 F.3d at 256 (citing States v. Sanchez, 943 F.2d 110, 113 (1st Cir. 1991)).

Neither the affidavit submitted in support of the June 3, 2020, Jeep Search Warrant nor the affidavit submitted in support of the June 8, 2020, Cell Phone search warrant offer any indication that Defendant has any privacy interest in the places to be searched. Further, and most important, Defendant fails to make any attempt before this Court to establish that he has standing to challenge either the June 3, 2020, Jeep Search Warrant or the June 8, 2020, Cell Phone Search Warrant. Defendant fails to offer any factual basis upon which the Court could reasonably conclude that he had a personal privacy interest in the Jeep Grand Cherokee. Similarly, the Defendant fails to offer any factual assertion upon which the Court could reasonably conclude that he had any expectation of privacy in the content of the three cell phones at issue.

On the record now before the Court each of the above delineated factors weighs in favor of finding that Defendant lacks standing to assert any challenge to evidence flowing from either the search of the Jeep Grand Cherokee or the three cell phones. Defendant fails to even allege that he has an ownership interest or control over the Jeep Grand Cherokee; fails to offer any factual allegation that he was ever inside the Jeep Grand Cherokee[16] or had an ability to regulate use of the Jeep Grand Cherokee; and he fails to even allege that he had a subjective expectation of privacy in Jeep Grand Cherokee. Moreover, nothing on the record now before the Court supports finding that Defendant had an objective expectation of privacy in the Jeep Grand Cherokee at the time the June 3, 2020, Jeep Search Warrant was issued or executed.

It is Defendant who bears the burden of proving a reasonable expectation of privacy in the area searched. Rakas, 439 U.S. at 130–31. Regarding the Jeep Grand Cherokee subject to the June 3, 2020, Jeep Search Warrant, Defendant has wholly failed to meet this burden.

On that basis, the Court concludes that Defendant lacks standing to challenge the search of the subject Jeep Grand Cherokee, and therefore, Defendant lacks standing to seek the suppression of any evidence flowing from the execution of the June 3, 2020, Jeep Search Warrant.

Regarding the June 8, 2020, Cell Phone Search Warrant, the record now before the Court likewise demonstrates that each of the aforementioned relevant factors weighs in favor of finding that Defendant lacks standing to assert any challenge to evidence flowing from the search of the

---

[16] In his memorandum, Defendant provides a bullet-point list of the search warrants at issue, and in that list, Defendant conclusorily describes that Jeep Grand Cherokee as the vehicle "driven by [his] cousin after the incident, with [Defendant] a passenger." (Def.'s Mem., [Docket No. 41], at 10). In apparent support of that assertion, Defendant cites to the affidavit in support of the June 3, 2020, Jeep Search Warrant; it merely states that a witness alleged Defendant was a passenger in the Jeep. That affidavit fails to support an assertion that Defendant was a passenger in the Jeep Grand Cherokee. In other words, Defendant cannot allege he had a subjective privacy interest in the Jeep Grand Cherokee without first affirmatively alleging that he was present in the Jeep Grand Cherokee. In fact, Defendant told SA Pinoniemi that he was not there. Even assuming solely for the sake of argument that Defendant admitted, and affirmatively asserted, that he had previously been a passenger in the Jeep Grand Cherokee, "[t]he mere fact he may have previously been a passenger is insufficient" to established standing to challenge the search. United States v. Anguiano, 795 F.3d 873, 878 (8th Cir. 2015).

three subject cell phones as a result of the execution of the June 8, 2020, Cell Phone Search Warrant. Defendant fails to even allege that he has any ownership interest or control whatsoever over any of the subject phones;[17] fails to offer any factual allegation that he ever used any of the subject phones or had an ability to regulate use of the subject phones; and he fails to even allege that he had a subjective expectation of privacy in any of the subject phones. Moreover, nothing on the record now before the Court supports finding that Defendant had an objective expectation of privacy in any of the subject phones at the time the June 8, 2020, Cell Phone Search Warrant was issued or executed.

It is Defendant who bears the burden of proving a reasonable expectation of privacy in the area searched. Rakas, 439 U.S. at 130–31. Regarding the three subject cell phones which were authorized to be searched by the June 8, 2020, Cell Phone Search Warrant, Defendant has wholly failed to meet his burden.

On that basis, the Court concludes that Defendant lacks standing to challenge the search of the three subject phones, and therefore, Defendant lacks standing to seek the suppression of any evidence flowing from the execution of the June 8, 2020, Cell Phone Search Warrant.

Therefore, to the extent Defendant's Motion to Suppress Searches and Seizures seeks an Order of this Court suppressing all evidence flowing from either the execution of the June 3, 2020, Jeep Search Warrant or the June 8, 2020, Cell Phone Search Warrant, the undersigned recommends that Defendant's Motion to Suppress Searches and Seizures, [Docket No. 29], be **DENIED**.

---

[17] In fact, in his memorandum, Defendant only mentions one of the Subject Phones, and he refers to that phone as "purported [sic] owned by him." (Def.'s Mem., [Docket No. 41], at 10). In support of his assertion that that phone is purportedly owned by him, Defendant cites to Government's Exhibit 4; however, nothing in Government Exhibit 4 asserts that any of the Subject Phones is owned by Defendant. Instead, the affidavit in support of the June 8, 2020, Cell Phone Search Warrant provides that one of the phones was located at the scene of the alleged assault with no indication as to the owner of the phone, and it further indicates that the other two Subject Phones were seized from inside the Jeep Grand Cherokee.

### C.  June 3, 2020, Search Warrant

Defendant also seeks an Order of this Court suppressing evidence flowing from the execution of the June 3, 2020, Search Warrant which authorized law enforcement to search Defendant's person; the residence in which Defendant had been when he was arrested; and a black Pontiac vehicle parked at the residence where Defendant had been arrested. Acknowledging that search of his person could have been done with a warrant as a search "incident to his arrest," Defendant does not seek to suppress evidence discovered as a result of the search of his person. (Def.'s Mem., [Docket No. 41], at 12). Defendant does challenge the search of the residence where he had been when he was arrested, as well as, the search of the vehicle parked at that residence on the basis that the affidavit in support of the June 3, 2020, Search Warrant fails to establish a nexus between the items to be searched for and the places to be searched. (Id.).

Here again, the Court must first address the threshold issue of standing. Defendant's Motion seeks to suppress evidence flowing from the search of the residence in which he was arrested, as well as, the Pontiac parked at that residence. Defendant again fails to discuss whether or not he possesses standing to argue for the suppression of evidence flowing from both the search of the residence and the search of the vehicle parked at that residence.

On the record now before the Court each of the previously outlined relevant factors, see gen., Gomez, 16 F.3d at 256, weighs in favor of finding that Defendant lacks standing to assert any challenge to the evidence flowing from the search of the vehicle at the residence as a result of the execution of the June 3, 2020, Search Warrant. Defendant fails to even allege that he has any ownership interest or control over the Pontiac at issue; fails to even allege that he ever used or was inside the vehicle; fails to allege that he had any ability to regulate access to the vehicle; and he fails to even allege that he had a subjective expectation of privacy in the vehicle.

Moreover, nothing on the record now before the Court supports finding that Defendant had an objective expectation of privacy in the vehicle, and Defendant has failed to demonstrate that the totality of the circumstances surrounding the execution of the June 3, 2020, Search Warrant merit finding that he had an expectation of privacy in the Pontiac parked outside the residence where he had been arrested. The Court concludes that Defendant lacks standing to challenge the search of the black Pontiac vehicle parked at the residence where he had been arrested, and therefore, Defendant lacks standing to seek the suppression of any evidence flowing from the search of said vehicle.

Therefore, to the extent Defendant's Motion to Suppress Searches and Seizures seeks an Order of this Court suppressing all evidence flowing from the execution of the June 3, 2020, Search Warrant as it relates to the search of Defendant's person or to the black Pontiac, the undersigned recommends that Defendant's Motion to Suppress Searches and Seizures, [Docket No. 29], be **DENIED**.

Accordingly, the Court's discussion hereafter of Defendant's request to suppress evidence flowing from the execution of the June 3, 2020, Search Warrant is limited solely to evidence flowing from the search of the inside of the residence where Defendant had been when he was arrested.

Defendant argues that said evidence should be suppressed because the affidavit in support of the June 3, 2020, Search Warrant failed to demonstrate a nexus between the items to be searched for and the residence at issue. Defendant's argument that the affidavit is "bare bones prose" ignores large portions of the affidavit submitted in support of the June 3, 2020, Search Warrant.

"[A] magistrate reviewing a warrant application is charged with the duty of determining whether a 'fair probability that contraband or evidence of a crime will be found in a particular

place.'" <u>United States v. Alexander</u>, 574 F.3d 484, 489 (8th Cir. 2009) (quoting <u>United States v. Hart</u>, 544 F.3d 911, 914 (8th Cir. 2008)). "[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue[.]" <u>United States v. Tellez</u>, 217 F.3d 547, 550 (8th Cir. 2000) (citing <u>United States v. Koelling</u>, 992 F.2d 817, 823 (8th Cir. 1993)).

Considering the affidavit submitted in support of the June 3, 2020, Search Warrant which authorized law enforcement to search the residence at issue, Judge Fritz could reasonably have concluded that there was a fair probability that evidence of the alleged assault would be found in the residence in which Defendant had been when he was arrest. The affidavit established a nexus between the evidence to be searched for and said residence.

Specifically, the Court notes that, in his affidavit, Inv. Peterson provided the details of the investigation, including the fact that two known witnesses reported seeing Defendant commit the alleged assault, seeing Defendant thrown a cinder block at the victim, seeing Defendant approach the unconscious body of the victim, and seeing Defendant search through the pockets of the victim. One of the witness saw the thrown cinder block strike the victim's head. Inv. Peterson's affidavit also provided that law enforcement officers had observed blood splatter on a cinder block. Moreover, Inv. Peterson's affidavit provided that Warren Brown had reported that Defendant was with him at the scene of the assault, and it was Defendant who fought with the victim. In addition, the affidavit noted that when Defendant was arrested, he was wearing shorts with "possible blood" stains plainly visible thereon. The affidavit further provided that when Defendant was initially found he was not wearing a shirt nor carrying a cell phone, although he did advise the law enforcement officers that he had a cell phone. Lastly, Inv. Peterson attested that based on his training and experience the type of evidence sought—such as trace or microscopic evidence, including but not limited to: blood samples, hairs, finger print evidence,

body fluids or excretions, as well as, clothing, fibers, soil, and cell phones—can be left or transferred to a residence by suspects involved in the incident or could be hidden in the residence where the suspect is located.

Upon review of Inv. Peterson's affidavit, this Court finds that Judge Fritz had a sufficient basis upon which to believe that probable cause existed for the issuance of the June 3, 2020, Search Warrant as it relates to inside the residence at issue. The affidavit contains information concerning Defendant's alleged involvement in the assault; Defendant's close quarters interaction with the bloodied, unconscious body of the alleged victim; statements from three known witnesses stating that Defendant was the person involved in the altercation with the alleged victim; and the fact that Defendant was discovered without a shirt but wearing shorts with possible blood stains visible thereon. Inv. Peterson also attested that—based on his training and experience—trace microscopic evidence such as blood samples can be transferred by a suspect into a residence. This is the exact type of evidence seen on Defendant's shorts, and the type of evidence which law enforcement sought to locate in the residence. Inv. Peterson likewise attested that items such as clothing can easily be removed and discarded within a residence, and Defendant was discovered inside the subject residence without a shirt <u>after</u> law enforcement officers had announced their presence. The affidavit articulates a sufficient basis upon which to find that a fair probability existed to conclude that the search would uncover evidence of a crime, as well as, a sufficient basis upon which to demonstrate a nexus between the items to be searched for and the residence to be searched; thus, there was probable cause for Judge Fritz to issue the warrant as it relates to the residence.

In addition, assuming solely for the sake of argument that the affidavit of Inv. Peterson was not sufficient to establish probable cause or a nexus between the items to be searched for and the place to be searched, the Court concludes that officers relied in good faith on the

probable cause determination by Judge Fritz when executing the June 3, 2020, Search Warrant as it relates to the residence.

Although evidence obtained as a result of the execution of a warrant unsupported by probable cause is generally inadmissible, <u>Mapp v. Ohio</u>, 367 U.S. 643 (1961), there is an exception "when the police conduct a search in 'objectively reasonable reliance' on a warrant later held invalid." <u>Davis v. United States</u>, 564 U.S. 229, 238-39 (2011) (quoting <u>United States v. Leon</u>, 468 U.S. 897, 922 (1984)). There are four circumstances in which the good-faith exception does not apply:

> (1) the magistrate judge issuing the warrant was misled by statements made by the affiant that were false or made "in reckless disregard for the truth"; (2) "the issuing magistrate judge wholly abandoned his [or her] judicial role"; (3) the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid.

<u>United States v. Marion</u>, 238 F.3d 965, 969 (2001). Here, Defendant generically asserts that the five at issue search warrants collectively all fall within the third <u>Leon</u> exception. Defendant, however, fails to offer any specific argument in support of that generic, conclusory assertion other than his overarching argument that the search warrants fail to establish probable cause.

The record currently before the Court shows that law enforcement's good-faith reliance on the warrant issued authorizing the search of the residence where Defendant had been when he was arrested militates against suppressing the evidence obtained during the execution of the June 3, 2020, Search Warrant. In his affidavit in support of his application for a search warrant, Inv. Peterson presented sufficient facts indicating that Defendant was the person who assaulted the victim, that Defendant had been in close proximity to the bloodied victim, and that although Defendant was missing his shirt, his shorts appeared to have blood stains on them. In his affidavit, Inv. Peterson further attested that evidence of the assault could have been transferred to

the residence where Defendant was located when he was arrested. Accordingly, the affidavit in support of the June 3, 2020, Search Warrant was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." In addition, it did not render the warrant "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid."

Thus, the Court concludes that the officers involved relied in good faith on the June 3, 2020, Search Warrant which had been issued by Judge Fritz.

Therefore, to the extent Defendant's Motion to Suppress Searches and Seizures seeks an Order of this Court suppressing evidence flowing from the execution of the June 3, 2020, Search Warrant, the undersigned recommends that Defendant's Motion to Suppress Searches and Seizures, [Docket No. 29], be **DENIED**.

### D.  June 4, 2020, DNA Search Warrant

Defendant also seeks an Order of this Court suppressing evidence flowing from the execution of the June 4, 2020, DNA Search Warrant which authorized law enforcement to take a buccal swab from Defendant's mouth, or in the alternative, a blood sample, if Defendant refused to cooperate. Here again, Defendant's sole argument is that the affidavit in support of the June 4, 2020, DNA Search Warrant fails to provide a nexus between the items to be searched for and the place to be searched. (Def.'s Mem., [Docket No. 41], at 13). Defendant's only assertion in support of this argument is that "there is no nexus provided between the pants and the offense, other than [sic] surmise that [Defendant's] clothing contains the alleged victim's blood." (Id.).

As discussed above, "a magistrate reviewing a warrant application is charged with the duty of determining whether a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Alexander, 574 F.3d 484, 489 (8th Cir. 2009) (quoting United States v. Hart, 544 F.3d 911, 914 (8th Cir. 2008)). "[T]here must be evidence of

a nexus between the contraband and the place to be searched before a warrant may properly issue[.]" <u>United States v. Tellez</u>, 217 F.3d 547, 550 (8th Cir. 2000) (citing <u>United States v. Koelling</u>, 992 F.2d 817, 823 (8th Cir. 1993)).

Considering the affidavit submitted in support of the June 4, 2020, DNA Search Warrant which authorized law enforcement to seize a DNA sample from Defendant, Judge Fritz could reasonably have concluded that there was a fair probability that evidence of the alleged assault would be found through Defendant's DNA sample.

Specifically, the Court notes that in his affidavit, submitted in support of the warrant application, Inv. Peterson provided the details of the investigation, including the fact that two known witnesses reported seeing Defendant commit the alleged assault, seeing Defendant thrown a cinder block at the victim, seeing Defendant approach the unconscious body of the victim, and seeing Defendant move the victim and search through the pockets of the victim. One of the witness saw the thrown cinder block strike the victim's head. Inv. Peterson's affidavit also provided that law enforcement officers had observed blood splatter on the cinder block. Moreover, Inv. Peterson's affidavit provided that Warren Brown had reported that Defendant was with him at the scene of the assault, and that it was Defendant who fought with the victim. In addition, the affidavit noted that when Defendant was arrested, he was wearing shorts with "possible blood" stains visible thereon. Inv. Peterson further attested that he had seized Defendant's shorts and underwear upon which Inv. Peterson observed dried blood stains. Lastly, Inv. Peterson attested that based on his training and experience "the comparisons of DNA evidence to known samples is the preferred method of processing and identifying DNA profiles," and he was requesting Defendant "submit to providing a known DNA sample for comparison purposes." (Gov't's Ex. 3).

Upon review of Inv. Peterson's affidavit, this Court finds that Judge Fritz had a sufficient basis upon which to believe that probable cause existed for the issuance of the June 4, 2020, DNA Search Warrant. The affidavit contains information concerning Defendant's alleged involvement in the assault; Defendant's close quarters interaction with the bloodied, unconscious body of the alleged victim; statements from three known witnesses that Defendant was the person involved in the altercation with the alleged victim; and the fact that Defendant's clothing had possible blood stains on them. Inv. Peterson also attested that—based on his training and experience—a known sample of Defendant's DNA was required for comparison purposes. The affidavit articulates a sufficient basis upon which to find that a fair probability existed to conclude that the search would uncover evidence of a crime.

The June 4, 2020, DNA Search Warrant sought a known DNA sample from Defendant to compare to both the blood on Defendant's shorts, as well as, the blood on the cinder block. Under similar circumstances, other Courts have reached the conclusion that "there was probable cause to believe that samples of [a] Defendant's DNA would furnish evidence of a crime." United States v. Willis, No. 11-cr-13 (DSD/JJK), 2011 WL 1100127, at *3 (D. Minn. Mar. 14, 2011), report and recommendation adopted, 2011 WL 1060981 (D. Minn. Mar. 23, 2011). The Court reaches the same conclusion in the present case.

In addition, assuming solely for the sake of argument that the affidavit of Inv. Peterson was not sufficient to establish probable cause, the Court concludes here too that officers relied in good faith on the probable cause determination by Judge Fritz when executing the June 4, 2020, DNA Search Warrant. See, gen., Leon, 468 U.S. at 922. The affidavit in support of the June 4, 2020, DNA Search Warrant, the contents of which have been discussed above, was not "so lacking in indicia of probable cause as to render official belief in its existence entirely

unreasonable." In addition, it did not render the warrant "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid."

Therefore, to the extent Defendant's Motion to Suppress Searches and Seizures seeks an Order of this Court suppressing evidence flowing from the execution of the June 4, 2020, DNA Search Warrant, the undersigned recommends that Defendant's Motion to Suppress Searches and Seizures, [Docket No. 29], be **DENIED**.

### E.  June 15, 2020, Facebook Search Warrant

Defendant also seeks an Order of this Court suppressing evidence flowing from the execution of the June 15, 2020, Facebook Search Warrant which authorized law enforcement to search the Facebook accounts of Warren Brown and Defendant. (Def.'s Mem., [Docket No. 41], at 13–14). Again, Defendant's sole challenge is that the affidavit in support of the June 15, 2020, Facebook Search Warrant fails to establish a nexus between the items to be seized and the place to be searched. (Id. at 10–11, 13–14).

The Court must once again first address the threshold issue of standing. Defendant's Motion seeks to suppress all evidence flowing from the June 15, 2020, Facebook Search Warrant. Defendant does not affirmatory limit his suppression request to only evidence flowing from the Facebook account belonging to him. As discussed above, the June 15, 2020, Facebook Search Warrant authorizes the search of two different accounts.  Nevertheless, Defendant fails to discuss whether or not he possesses standing to argue for the suppression of evidence flowing from both accounts.

On the record now before the Court each of the previously described relevant factors, Gomez, 16 F.3d at 256, weighs in favor of finding that Defendant lacks standing to assert any challenge to evidence flowing from the search of Warren Brown's Facebook account. Defendant fails to allege that he even has any ownership interest or control over Mr. Brown's Facebook

account; fails to even allege that he ever used Mr. Brown's Facebook account; fails to allege that he had any ability to regulate access to Mr. Brown's Facebook account; and he fails to even allege that he had a subjective expectation of privacy in Mr. Brown's Facebook account. Moreover, nothing on the record now before the Court supports finding that Defendant had an objective expectation of privacy in Warren Brown's Facebook account. On that basis, the Court concludes that Defendant lacks standing to challenge the search of Warren Brown's Facebook account, and therefore, Defendant lacks standing to seek the suppression of any evidence flowing from the search of Warren Brown's Facebook account.

Therefore, to the extent Defendant's Motion to Suppress Searches and Seizures seeks an Order of this Court suppressing all evidence flowing from the execution of the June 15, 2020, Facebook Search Warrant, including evidence from Warren Brown's Facebook account, the undersigned recommends that Defendant's Motion to Suppress Searches and Seizures, [Docket No. 29], be **DENIED**.

Accordingly, the Court's discussion hereafter of Defendant's request to suppress evidence flowing from the execution of the June 15, 2020, Facebook Search Warrant is limited solely to evidence flowing from the search of his own Facebook account.

Defendant once again conclusorily argues that said evidence should be suppressed because the affidavit in support of the June 15, 2020, Facebook Search Warrant failed to demonstrate a nexus between the items to be searched for and the place to be searched. Defendant's argument is premised on a mischaracterization of Inv. Larson's affidavit in support of the June 15, 2020, Facebook Search Warrant.

As already discussed several times above, "a magistrate reviewing a warrant application is charged with the duty of determining whether a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Alexander, 574 F.3d 484, 489 (8th

Cir. 2009) (quoting <u>United States v. Hart</u>, 544 F.3d 911, 914 (8th Cir. 2008)). "[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue[.]" <u>United States v. Tellez</u>, 217 F.3d 547, 550 (8th Cir. 2000) (citing <u>United States v. Koelling</u>, 992 F.2d 817, 823 (8th Cir. 1993)).

Considering the affidavit submitted in support of the June 15, 2020, Facebook Search Warrant which authorized law enforcement to search Defendant's Facebook account, Judge Thilmony could reasonably have concluded that there was a fair probability that evidence of the alleged assault would be found in Defendant's Facebook account. Specifically, the Court notes that in his affidavit Inv. Larson provided the details of the investigation, including the fact that two known witnesses reported seeing Defendant commit the alleged assault, seeing Defendant thrown a cinder block at the victim, seeing Defendant approach the unconscious body of the victim, and seeing Defendant search through the pockets of the victim. One of the witness saw the thrown cinder block strike the victim's head. Moreover, Inv. Larson's affidavit provided that Warren Brown had reported that Defendant was with him at the scene of the assault, and it was Defendant who fought with the victim. Inv. Larson also attested that he had observed the security camera photographs obtained by law enforcement which showed Defendant at the scene of the alleged assault during the alleged assault. Importantly, Inv. Larson also attested that Warren Brown had informed law enforcement that Defendant did not then currently have a cell phone, so Warren Brown had been communicating with Defendant through Facebook. Inv. Larson verified this by observing Defendant's Facebook account, and he found that Defendant's Facebook account had recent and current activity which he believed to indicate that the account was active. Lastly, Inv. Larson attested that based on his training and experience individuals involved in or associated with criminal activity often use third party application, such as Facebook, to communicate in an attempt to avoid law enforcement detection.

This Court finds that Judge Thilmony had a sufficient basis upon which to believe that probable cause existed for the issuance of the June 15, 2020, Facebook Search Warrant as it relates to Defendant's personal Facebook account. The affidavit contains significant information concerning Defendant's alleged involvement in the assault, and that Warren Brown, present at the time of the assault, communicated with Defendant exclusively through Facebook. Inv. Larson also attested that—based on his training and experience—persons involved in criminal activity often use Facebook to communicate as a means to avoid detection by law enforcement, and Defendant's Facebook account had been recently active. The affidavit articulates a sufficient basis upon which to find that a fair probability existed to conclude that the search would uncover evidence of a crime; thus, there was probable cause to issue the warrant as it relates to Defendant's personal Facebook account.

In addition, the Court here too concludes that officers relied in good faith on the probable cause determination by Judge Thilmony when executing the June 15, 2020, Facebook Search Warrant as it relates to Defendant's Facebook account. See, gen., Leon, 468 U.S. at 922.

The record currently before the Court shows that law enforcement's good-faith reliance on the warrant issued authorizing the search of Defendant's Facebook account militates against suppressing the evidence obtained during the execution of the June 15, 2020, Facebook Search Warrant. The affidavit in support of the June 15, 2020, Facebook Search Warrant was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Nor did it render the warrant "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid."

Thus, the Court concludes that the officers involved relied in good faith on the June 15, 2020, Facebook Search Warrant which had been issued by Judge Thilmony.

Therefore, to the extent Defendant's Motion to Suppress Searches and Seizures seeks an Order of this Court suppressing evidence flowing from the execution of the June 15, 2020, Facebook Search Warrant, the undersigned recommends that Defendant's Motion to Suppress Searches and Seizures, [Docket No. 29], be **DENIED**.

## IV.    Conclusion

Therefore, based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1.  Defendant's Motion to Suppress Statements, [Docket No. 28], be **GRANTED in part** and **DENIED in part**, as set forth above; and

2.  Defendant's Motion to Suppress Searches and Seizures, [Docket No. 29], be **DENIED**.


Dated: December 21, 2020                      s/ Leo I. Brisbois
                                             Hon. Leo I. Brisbois
                                             U.S. MAGISTRATE JUDGE


# N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.