# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 20-CR-143 (NEB/LIB) |
| Plaintiff, | |
| v. | ORDER ACCEPTING REPORT AND RECOMMENDATION |
| WESLEY ROBERT WARREN, | |
| Defendant. | |

---

Defendant Wesley Robert Warren is charged with four counts relating to the assault and robbery of R.H. on June 3, 2020.[1] (ECF No. 1.) Warren moves to suppress statements he made during his arrest and evidence stemming from searches and seizures made pursuant to five search warrants. (ECF Nos. 28, 29.) In the Report and Recommendation dated December 21, 2020, United States Magistrate Judge Leo I. Brisbois recommends granting in part and denying in part Warren's motion to suppress statements, and denying Warren's motion to suppress evidence. (ECF No. 45.) The Court conducts a *de novo* review of the parts of the R&Rs to which Warren objects, (ECF No. 50 ("Obj.")). 28 U.S.C. § 636(b)(1); *Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995).

---

[1] Warren was charged by indictment with (1) assault with intent to commit murder, (2) assault with a dangerous weapon, (3) assault resulting in serious bodily injury, and (4) robbery. (ECF No. 1 (alleging violations of 18 U.S.C. §§ 113(a)(1) & (6), 1151, 1153(a), 2111).)

The R&R provides a detailed account of Warren's arrest as well as the applications for and issuance of the five search warrants. (R&R at 2–12; Gov't Exs. 1–5.) Warren's arrest is also reflected in testimony at the hearing on his suppression motions, (ECF No. 40), and in the audio recording and two body camera videos submitted by the government at that hearing. (Gov't Exs. 6–8.) The Court includes here only those facts necessary to rule on Warren's objections.

## ANALYSIS

### I.      Motion to Suppress Statements

The R&R recommends denying the motion to suppress two statements Warren made during his arrest: (1) Warren's un-Mirandized statement to Becker County Sheriff's Office Special Agent ("SA") Mark Pinoniemi after SA Pinoniemi told Warren why the agents were speaking with him, and (2) Warren's statements to an unknown female family member while SA Pinoniemi was asking Warren questions.[2] (R&R at 15–20.) The

---

[2] The parties do not object to the R&R's recommendations to grant Warren's motion to suppress the following statements: (1) Warren's response to White Earth Police Department Investigator Breeann Brandenberger's inquiry regarding what was on Warren's shorts at the time he was arrested; (2) his response to Inv. Brandenburger's inquiry regarding what had happened to Warren's foot; (3) his response to SA Pinoniemi's question regarding his place of residence; and (4) his response to Inv. Brandenburger's request to photograph his hands at the Becker County Jail. (R&R at 12–13 & n.14; *see* ECF No. 44 at 8 (reflecting the government's agreement not to utilize these statements).) Having reviewed these recommendations, the Court finds no clear error and accepts them.

R&R concludes that both statements were voluntary and spontaneous. (*Id.*) Warren objects to this conclusion. (Obj. at 3–4.)

### A. Warren's Un-Mirandized Statement to SA Pinoniemi

"*Miranda*[3] warnings are required when a defendant is in custody and is being interrogated." *United States v. McGlothen*, 556 F.3d 698, 701 (8th Cir. 2009). Because Warren was in custody when he made the un-Mirandized statement to SA Pinoniemi, the issue is whether SA Pinoniemi was interrogating Warren at the time. An interrogation includes "words or actions that officers should know are 'reasonably likely to elicit an incriminating response from the suspect,'" but "[v]oluntary statements not in response to an interrogation are admissible with or without *Miranda* warnings." *Id.* (quoting *United States v. Londondio*, 420 F.3d 777, 783 (8th Cir. 2005)); *see Miranda*, 384 U.S. at 478 ("Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence."). Generally, courts "do not find a mere factual statement to be an interrogation where it serves to inform the suspect as to the status of his case or the investigation into his activities." *United States v. Hull*, 419 F.3d 762, 767 (8th Cir. 2005); *see Arizona v. Roberson*, 486 U.S. 675, 687 (1988) (explaining officers "are free to inform the suspect of the facts of the [] investigation as long as such communication does not constitute interrogation"). Warren acknowledges that a law enforcement officer's announcement of the purpose for the officer's presence is not an interrogation, but argues

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

3

that SA Pinoniemi's statement to him was "in the nature of an inquiry, designed to elicit an immediate response" because SA Pinoniemi wanted to know what happened the night before. (Obj. at 6.)

The video and audio recordings demonstrate that SA Pinoniemi introduced himself, told Warren he was in custody and under arrest because of a DOC warrant, and explained that he "would like to talk to [Warren] about last night and what kinda happened out there, why it happened the way it happened, stuff like that." (Gov't Ex. 8 at 1:32–1:49 (video recording).) Warren answered, "I don't even know what you're talking about." (*Id.*) SA Pinoniemi said he could explain things to Warren, but he first needed to inform him of his rights; he then read Warren his *Miranda* rights. (*Id.*; *see also* Gov't Ex. 7 at 1:18–1:25 (audio recording).) Having reviewed the evidence, the Court agrees with the R&R's finding that SA Pinoniemi did not ask Warren any questions, or say or do anything that was reasonably likely to elicit an incriminating response before Warren told SA Pinoniemi that he did not know what SA Pinoniemi was talking about. (R&R at 16–17.) As such, SA Pinoniemi was not interrogating Warren when he made this statement; rather, Warren's statement was voluntary and spontaneous, so it need not be suppressed. *E.g.*, *United States v. Hayes*, 120 F.3d 739, 744 (8th Cir. 1997) (holding no *Miranda* violation occurred where the agent explained that he wanted to ask the defendant questions concerning the events of the day of a robbery and the defendant volunteered information as to her whereabouts on that day); *Hull*, 419 F.3d at 767

(holding that officer's statement was merely a statement of fact concerning the status of the investigation against defendant, and not an interrogation); *United States v. Barnes*, 195 F.3d 1027, 1029 (8th Cir. 1999) (holding that defendant's statements were spontaneous, and the officer's remark that he was going to be charged with possession of a firearm was a statement of fact).[4]

### B.  Warren's Statements to His Family Member

The R&R also concludes that Warren's statements to a family member while he was sitting in an officer's vehicle and SA Pinoniemi was asking him questions were spontaneous and voluntary. (R&R at 18–20.) Warren argues that because he had invoked his right to counsel, SA Pinoniemi should have closed the vehicle's door so that he could not speak others, but instead he "permitted the crowd vicariously to accomplish what he

---

[4] Warren contends that that the R&R wrongfully relied upon *McGlothen*, a case in which, before the defendant made an un-Mirandized statement, a law enforcement officer showed a handgun to the defendant and explained that the defendant would be charged as a felon in possession of a firearm. 556 F.3d at 700–01. Warren insists that *McGlothen* is distinguishable because SA Pinoniemi did not show Warren a piece of evidence and announce a certain charge would be brought. (Obj. at 7.) But the Eighth Circuit did not base its decision on the officer's presentation of the gun. Rather, it held that "the officer's words indicating that McGlothen was to be charged with possession of a firearm were statements of fact, not the functional equivalent of an interrogation." *Id.* at 702. The Eighth Circuit has consistently held that "*Miranda* does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers." *United States v. Crisolis-Gonzalez*, 742 F.3d 830, 837 (8th Cir. 2014), *as corrected* (Feb. 11, 2014) (quoting *Hayes*, 120 F.3d at 744). Here, SA Pinoniemi explained that Warren was being arrested based on a DOC warrant and that he wished to ask Warren about what happened the previous night. His explanation to Warren did not amount to an interrogation. *See, e.g., Hayes*, 120 F.3d at 744.

could not do on his own," and offered Warren an "implied invitation to speak." (Obj. at 8–9.)

If an accused requests counsel, "the interrogation must cease until an attorney is present." *Edwards v. Arizona*, 451 U.S. 477, 482 (1981). But once an accused initiates further communication with law enforcement, nothing in the Fifth or Fourteenth Amendments prohibits the officers from "merely listening to his voluntary, volunteered statements and using them against him at the trial." *Id*. at 485. Where, as here, an accused in custody requests a lawyer and subsequently makes a statement to law enforcement, the question is whether law enforcement elicited the statement by interrogating the accused. *Rhode Island v. Innis*, 446 U.S. 291, 298 (1980). An accused's statement is not the product of interrogation unless it is in response to questions, words, or actions on the part of the officers that they "should know are reasonably likely to elicit an incriminating response." *Id*. at 301.

The video recording shows that after SA Pinoniemi gave Warren *Miranda* warnings while Warren was sitting in the back of the vehicle, Warren asked SA Pinoniemi why he was being arrested. (Gov't Ex. 8 at 2:00–3:44 (video recording).) After hearing the agents' explanation, Warren invoked his right to remain silent and to counsel, and then spoke loudly, "love you guys, see you," to someone nearby. (*Id*.) SA Pinoniemi then questioned Warren about where he lived, and another agent asked who owned the residence. (*Id*.) Warren responded that the residence belonged to his grandmother. (*Id*.)

6

SA Pinoniemi then asked for Warren's grandmother's name. (*Id.*) Warren continued to speak loudly to a person nearby, telling her that he "don't know even what the f**k was going on. They trying to say I robbed [indiscernible] or something." (*Id.*) The person asked if Warren did it, and he responded, "No, I was f**king sleeping last night," all the while the agents were asking his grandmother's name and the name of the person to whom Warren was speaking. (*Id.*) Warren identified the person as his mother, but refused to answer SA Pinoniemi's question as to her name, then told her, "love you." (*Id.*) SA Pinoniemi then closed the vehicle door. (*Id.*; *see also* Gov't Ex. 7 at 1:36–3:20 (audio recording).)

There is no legal support for Warren's assertion that SA Pinoniemi should have closed the vehicle door to prevent Warren from speaking to his family member. Based on a *de novo* review, the Court concludes that SA Pinoniemi's actions were not an attempt to solicit an incriminating response from Warren; rather, Warren's statements to his family member were clearly spontaneous and voluntary.[5]

---

[5] Warren argues that two cases cited in the R&R—*McGlothen* and *United States v. Chipps,* 410 F.3d 438 (8th Cir. 2005)—did not address an agent's effort to have the defendant discuss the offense with third parties after invocation of his *Miranda* rights. (Obj. at 9.) But the fact that these cases involved statements directed to law enforcement rather than third parties is inconsequential. "*Miranda* does not bar the government from introducing into evidence spontaneous statements made during a conversation not initiated by the officer." *Chipps,* 410 F.3d at 445 (citations omitted); *Crisolis-Gonzalez,* 742 F.3d at 837. The record shows Warren chose to speak with this family member while the agents were questioning him. His statements were voluntary and not in response to any agent's words and actions that would be reasonably likely to elicit an incriminating response. *McGlothen,* 556 F.3d at 701.

## II.    Motion to Suppress Search and Seizure

Warren also moves to suppress evidence obtained by five search warrants, arguing that each lacks probable cause: (1) the June 3, 2020 Search Warrant; (2) the June 3, 2020 Jeep Search Warrant; (3) the June 4, 2020 DNA Search Warrant; (4) the June 8, 2020 Cellular Phone Search Warrant; and (5) the June 15, 2020 Facebook Search Warrant. (Gov't Exs. 1–5.) The R&R determines that Warren lacks standing to challenge the Jeep and cellular phone warrants. (R&R at 22–25.) The R&R also concludes that Warren either lacks standing to challenge aspects of the remaining warrants, or, where he has standing, the warrants were based on probable cause, and even if no probable cause existed, they were subject to the good faith exception. (*Id.* at 25–38.) Warren contests some of the R&R's determinations regarding standing, and brings an "omnibus challenge" to all five warrants because the affidavits supporting the warrants share a factual predicate. (Obj. at 10–12.) As in his initial motion, Warren argues in a general manner that the affidavits lack a nexus between the crime and the subjects to be searched, and that the good faith exception does not apply. (Obj. at 11–12; ECF No. 41 at 10–11.) The Court will address each warrant in turn.

### A. *Legal Standard*

The Fourth Amendment requires law enforcement to show probable cause, supported by oath or affirmation, before a search warrant is authorized. U.S. Const. amend. IV. "An individual asserting Fourth Amendment rights 'must demonstrate that

he personally has an expectation of privacy in the place searched, and that his expectation is reasonable.'" *United States v. Barragan*, 379 F.3d 524, 529 (8th Cir. 2004) (citing *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)). "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally." *Id.* at 529–30 (quotation omitted).

Assuming a defendant has standing to claim that a search warrant was illegal, courts consider the totality of the circumstances to determine whether the affidavit supporting a warrant is sufficient to demonstrate probable cause. *United States v. Keele*, 589 F.3d 940, 943 (8th Cir. 2009) (citation omitted). "Probable cause exists if the warrant application and affidavit describe circumstances showing a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (quotation omitted).

The typical sanction for a violation of the Fourth Amendment is suppression of the evidentiary fruits of the violation. *United States v. Houston*, 665 F.3d 991, 994 (8th Cir. 2012). But this rule does not apply "'when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope.'" *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 920 (1984)). Under the good faith exception, disputed evidence will not be suppressed if the officer acted "in objectively reasonable reliance on a subsequently invalidated search warrant." *Leon*, 468 U.S. at 922. An officer's reliance is not objectively reasonable when the affidavit supporting the warrant was "so

lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."[6] *Id.* at 923 (quotation omitted).

### B. June 3, 2020 Search Warrant

The June 3, 2020 Search Warrant authorized law enforcement to search the residence where Warren was arrested ("June 3 Warrant").[7] (Gov't Ex. 1.) Warren contends that the affidavit supporting the June 3 Warrant fails to demonstrate a nexus between the items to be searched for and the residence at issue, claiming that the affidavit's statement that "suspects can move or hide evidence in vehicles or other buildings/sheds" is "bare bones prose" and not specific to the crime or the residence to be searched. (Obj. at 13 (citing Gov't Ex. 1 at 5).) But the affidavit recounts multiple witnesses' description of Warren assaulting R.H., then rolling R.H. over and searching his pockets. (Gov't Ex. 1 at 2–3.) It also states that Warren's shorts appeared to have blood on them, that he was not

---

[6] Warren does not raise the three other circumstances in which an officer's reliance is not objectively reasonable: (1) the affidavit supporting the warrant included a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) the judge "wholly abandoned his judicial role" in issuing the warrant; and (3) the warrant is "so facially deficient" that the executing officer could not reasonably presume the warrant was valid. *Leon*, 468 U.S. at 923 (citations omitted).

[7] The June 3 Warrant also authorized the search of Warren's person and a black Pontiac vehicle parked at the residence where Warren was arrested. (Gov't Ex. 1.) Warren concedes that the search of his person was permitted without a warrant as incident to his arrest, and acknowledges that nothing of substance was found in the Pontiac, and so, the R&R's conclusions relating to the Pontiac are "of no consequence." (Obj. at 13.) The Court therefore focuses on the search of the residence.

wearing a shirt when he was arrested at the residence, and that he stated that he had a cellular phone but did not tell the officers where it was. (*Id.* at 3–4.) Based on a *de novo* review, the Court finds that the issuing judge could reasonably have concluded that a fair probability existed that evidence of the alleged assault would be found in the residence where Warren was arrested.

Moreover, Warren fails to raise any specific objection to the R&R's finding that the good faith exception applies to the June 3 Warrant. Even if the warrant was not supported by probable cause, this is not a case where the affidavit supporting the warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923. Because the officers involved acted in objectively reasonable reliance on the June 3 Warrant, and the good faith exception applies.

### C.  June 3, 2020 Jeep Search Warrant

Warren argues that he has standing to challenge the June 3, 2020 Jeep Search Warrant, which authorized law enforcement to search a tan Jeep Grand Cherokee that Warren Brown ("Brown") was driving when Brown was arrested. (Gov't Ex. 2.) Warren relies on *Brendlin v. California*, 551 U.S. 249 (2007), which permits a "passenger to litigate the stop of the car and subsequent seizure of evidence the moment it occurs." (Obj. at 14.) *Brendlin* has no application here, because unlike the defendant in *Brendlin*, Warren was not a passenger in the Jeep when it was stopped by law enforcement. *Brendlin* held that a passenger of a stopped vehicle "is seized within the meaning of the Fourth Amendment"

and "so may challenge the constitutionality of the stop." 551 U.S. at 251. Warren does not

cite, and the Court has not discovered, any case law that extends the holding of *Brendlin*

to a person who was previously a passenger in a vehicle in which he has no property or

possessory interest. Rather, the mere fact that an individual "may have previously been

a passenger is insufficient" to show standing to challenge the constitutionality of a search

warrant for the vehicle. *United States v. Anguiano*, 795 F.3d 873, 878 (8th Cir. 2015); (R&R

at 24 n.16.)

### D.  June 4, 2020 DNA Search Warrant

The June 4, 2020 DNA Search Warrant authorized law enforcement to take an oral

swab of Warren's mouth or his blood sample to compare to the blood on Warren's shorts

and the blood on the cinder block that struck R.H. ("DNA Warrant"). (Gov't Ex. 3.)

Warren acknowledges that the affidavit supporting the DNA Warrant refers to blood

stains observed on Warren's shorts, but argues that no nexus exists between the shorts

and the offense other than to surmise that Warren's clothing contains the alleged victim's

blood. (Obj. at 14.) The Court disagrees. In addition to noting the blood stains on Warren's

shorts, the affidavit supporting the warrant states that: a witness saw Warren and R.H.

fighting and R.H. being knocked unconscious; witnesses saw Warren throw a cinder

block at R.H., one of whom saw the cinder block strike R.H. in the back of the head;

witnesses saw Warren roll R.H. on his back and go through his pockets; and the deputy

who took possession of the cinder block reported that it appeared to have blood on it.

(Gov't Ex. 3 at 2.) Based on a *de novo* review, the Court finds that probable cause existed to issue the DNA Warrant, and even if probable cause did not exist, the officers involved acted in objectively reasonable reliance on the warrant.[8]

### E.  June 8, 2020 Cellular Phone Search Warrant

The June 8, 2020 Cellular Phone Search Warrant authorized law enforcement to search the contents of three cellular phones ("Cellular Phone Warrant"). (Gov't Ex. 4.) The affidavit supporting this warrant states that the first phone "was thrown at the house" near where R.H. was assaulted, an officer collected the second phone from Brown after stopping him in his Jeep, and an officer found the third phone in Brown's Jeep. (*Id.* at 4.) The R&R concludes that Warren lacks standing to challenge the search of these phones. Warren contends that *if* the government takes the position at trial that one of the cellular phones belongs to Warren, then he has standing. (Obj. at 15 (citing *United States v. Morales*, 737 F.2d 761, 763 (8th Cir. 1984)); *see Morales*, 737 F.2d at 763–64 (rejecting the government's attack on the defendant's standing to challenge the search of a hotel room in part because the government changed its position from the trial to the appeal).

The affidavit supporting the Cellular Phone Warrant does not give any indication that the phones belong to Warren. (Gov't Ex. 4; R&R at 25 n.17.) And the government has consistently represented to the Court that the phones were located "at the scene of the

---

[8] Warren does not raise any specific objection to the R&R's finding that the good faith exception applies to the DNA Warrant.

crime and in a vehicle not belonging to or occupied by [Warren]." (ECF No. 44 at 16; *see* ECF No. 54 at 5 (noting "Warren cannot claim standing in items that are either not his or abandoned.")); *United States v. Gomez*, 16 F.3d 254, 256–57 (8th Cir. 1994) (affirming the conviction and distinguishing *Morales* where the government "contended throughout the pendency of the proceedings" that the defendant lacked standing to challenge the legality of a search). Because Warren has not shown that he has any expectation of privacy in the content of the phones, he lacks standing to seek the suppression of any evidence flowing from the execution of the Cellular Phone Warrant.

### F.  June 15, 2020 Facebook Search Warrant

The June 15, 2020 Facebook Search Warrant authorized law enforcement to search Warren's Facebook account ("Facebook Warrant").[9] (Gov't Ex. 5.) Warren objects to the search of his Facebook account, arguing that the R&R errs because the warrant is "too thin." (Obj. at 15.) He selectively cites to the affidavit supporting the warrant, asserting that it shows "only a possibility" of finding communications between Warren and Brown based on the affidavit's assertion that "individuals often use third party applications such as Facebook and Snapchat," and that this does not prove that Warren and Brown had a Facebook chat after R.H.'s assault and their arrests. (*Id.* at 16.) He also contends that this

---

[9] The Facebook Warrant also authorized the search of Brown's Facebook account. (Gov't Ex. 5.) The R&R concludes that Warren lacks standing to seek the suppression of evidence from the search of Brown's account, (R&R at 34–35), and in his objection, Warren clarifies that he does not contest the search of this account. (Obj. at 15.) Having reviewed this conclusion, the Court finds no clear error and therefore accepts it.

is not evidence that he used Facebook in "planning, carrying out the activities and concealing items received or used during the illegal activity." *(Id.* (presumably quoting Gov't Ex. 5 at 3).)

Warren ignores the important information in the affidavit supporting the warrant. The affidavit provides Brown's eyewitness account of Warren's assault of R.H. and Brown's explanation that, at that time, Warren did not have a cellular phone and communicated with Brown using Facebook. (Gov't Ex. 5 at 3.) The affidavit also states that there was recent activity on Warren's Facebook account, indicting an actively used account. (*Id.* at 4.) Neither Warren nor Brown were arrested at the scene of the assault; they were arrested later that day. (*Id*. at 3.) This information, coupled with the attesting officer's training and experience that persons involved in crime often use Facebook to communicate as a way to avoid detection by law enforcement, (*id.*), describe circumstances showing a fair probability that evidence of a crime will be found in the search of Warren's Facebook account, and thus, probable cause existed for the warrant.

Even if probable cause did not exist, the officers involved acted in objectively reasonable reliance on the Facebook Warrant. Upon a *de novo* review of the affidavit supporting the warrant, the Court finds that it is not "so lacking in indicia of probable cause" that the officers' belief in its existence was "entirely unreasonable." *Leon*, 468 U.S. at 923. Warren offers no specific reason that the *Leon* good faith exception should not apply to this warrant, and upon *de novo* review, the Court finds none.

## CONCLUSION

Based upon all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.    Warren's objections (ECF No. 50) are OVERRULED;

2.    The Report and Recommendation (ECF No. 45) is ACCEPTED;

3.    Defendant's Motion to Suppress Statements (ECF No. 28) is GRANTED IN PART and DENIED IN PART as set forth in this Order; and

4.    Defendant's Motion to Suppress Searches and Seizures (ECF No. 29) is DENIED.

Dated: March 1, 2021                          BY THE COURT:

                                              s/Nancy E. Brasel
                                              Nancy E. Brasel
                                              United States District Judge

16